IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 9, 2024

**STATE OF TENNESSEE v. GARDTRELLA MARIE DAY-KNOWLES**

**Appeal from the Criminal Court for Davidson County**
**No. 2020-A-689      Jennifer Smith, Judge**

_____

**No. M2023-00644-CCA-R3-CD**

_____

The Appellant, Gardtrella Marie Day-Knowles, was convicted by a Davidson County jury of neglect of an impaired adult, for which she received a sentence of seven years' supervised probation. See Tenn. Code Ann. § 71-6-117 (2017) (amended 2019, repealed 2020). On appeal, the Appellant argues that the trial court erred by: (1) allowing witnesses to describe conditions of animal neglect in her home; (2) refusing to redact an unfairly prejudicial comment from the victim's medical records; and (3) allowing a witness to testify about her memory of the contents of a report under the public records hearsay exception. After review, we conclude there was no reversible error and affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, P.J., delivered the opinion of the court, in which JILL BARTEE AYERS, and MATTHEW J. WILSON, JJ., joined.

Martesha Johnson Moore, District Public Defender, and Emma Rae Tennent (on appeal) and Casey Elliot and Crandall Story (at trial), Assistant District Public Defenders, for the appellant, Gardtrella Marie Day-Knowles.

Jonathan Skrmetti, Attorney General and Reporter; Katherine Orr, Assistant Attorney General; Glenn Funk, District Attorney General; and Brittani Flatt and Mindy Vincore, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The victim, Cheoril Howard, suffered an anoxic brain injury in 2006 that resulted in an inability to walk, speak, swallow, or control her bladder and bowel. Her daughter,

the Appellant, became her caretaker. For eleven years, TennCare provided the victim with home health services. In 2018, however, the victim lost her insurance coverage and the home health services ceased.

On October 25, 2018, the Appellant called 911 because the victim was seizing. When emergency personnel arrived, they discovered the victim in horrific conditions. The home smelled of feces, urine, and "death." The floor was covered in feces and trash. The victim's PEG, or feeding tube, was non-functioning, meaning that she had not been receiving adequate nutrition or medication. She was severely underweight, covered in bugs and feces, and lying in rotten feeding solution. The bed sores on her body and the large indentation in her mattress indicated that she had been lying in the same position for a long period of time. The victim was transported to the hospital, and the Appellant was later charged with gross neglect of an impaired adult. See Tenn. Code Ann. § 71-6-119 (2007) (amended 2019, repealed 2020).

**Pretrial Motions in Limine**. Defense counsel filed several pretrial motions in limine to exclude evidence. As relevant to this appeal, she filed a Rule 404 motion to exclude evidence of prior bad acts relating to the Appellant's animals and a Rule 401/403 motion to redact statements contained in the victim's medical records. See Tenn. R. Evid. 401, 403, 404.

The Rule 404 motion specifically sought to prohibit references to animal control, testimony about animals or their conditions, and photographs of animals or their living conditions. Defense counsel argued that such evidence was inadmissible because its only purpose was to show that the Appellant neglected her animals and therefore must have also neglected her mother. During a hearing on the motion, she argued that the animal control officer should be prohibited from testifying entirely because her testimony would be both cumulative and prejudicial. The State said it did not intend to introduce photographs of the animals or ask any witnesses about the neglect of the animals. The State argued, however, that the condition of the home including the animal feces, "overflowing" litter box, and ammonia smell was relevant evidence. The trial court denied the motion in part, stating:

> The animal control officer has direct knowledge about the condition of the residence, about the odor, about the things that she saw involving the feces and the litter box and the stability of the flooring and other things that are absolutely relevant to a charge of neglect, which is a continuing offense. And I'm not going to limit the State's case, certainly not on cumulative grounds, because of the burden that they bear.

- 2 -

I will prohibit the [] animal control officer from testifying or offering any testimony about potential neglect of animals or the condition of the animals themselves.

The court also directed the State not to introduce photographs of the dog.

The Rule 401/403 motion sought to redact several statements from the victim's medical records that contained "inflammatory, prejudicial, and irrelevant language." As relevant to this appeal, defense counsel sought to redact the following statement:

APS ["Adult Protective Services"] contacted. It will be a travesty if APS does not seek removal from her current living situation. The patient had a clogged PEG tube and was not receiving nutrition nor medication. She was covered in excrement (per EMS) and her daughter will not participate in her discussions regarding her care (per Palliative Care). Long term placement will be needed.

At a hearing on the motion, defense counsel argued that it would "not [be] proper for the jury to review [Dr. Carrico's] opinion on that. It is inflammatory language and it is greatly prejudicial and not probative in this case at all." The State argued that the language was not inflammatory and was simply "verification of what he observe[d] about [the victim's] condition and what he wants to see happen with [her] treatment plan[.]" The trial court ruled that the statement was admissible because "it has to do with . . . the discharge planning and [] the doctor's opinion about where she should be living during that [] post[-]discharge period is relevant[.]"

**Trial**. At trial, Karin Jenkins, a former captain and Emergency Medical Technician ("EMT") for the Nashville Fire Department, testified that on October 25, 2018, she and another EMT were dispatched to a home for reported seizures. When they arrived, the Appellant opened the door. The home was "in total disarray." There was an "unbelievable stench of feces and urine," and piles of feces on the couch and floor. In the kitchen, there was a dog. The floor was torn and "looked like [the dog] had been trying to eat [it]." There was a sink full of dirty dishes, "rotten [and] molding." A photograph of the kitchen was admitted into evidence.

When Ms. Jenkins reached the victim's room, she smelled "the stench of decay." The victim was curled in a ball on a hospital bed, seizing. Bugs were crawling on her and the bed. There was a feeding bag hanging from an IV pole, but the tube that attached to the victim had fallen on the floor. The floor was "covered in filth" and "unrecognizable as carpet." A photograph of the feeding tube on the floor was admitted into evidence. The Appellant told Ms. Jenkins she fed the victim approximately thirty minutes before and the

feeding tube must have disconnected during the seizure. Ms. Jenkins did not believe the Appellant because both the inside of the feeding bag and the victim's feeding port in her abdomen were "dry and crusty." Photographs of the feeding bag were admitted into evidence.

Ms. Jenkins described the victim as "filthy." The victim's hair was matted and she was wearing a full diaper that had been there "for way, way, way too long." She was "unbelievably underweight" and dehydrated. When Ms. Jenkins and the other EMT lifted the victim, a bed sheet stuck to her body. They transported the victim with the sheet because they feared they could not safely separate it from her skin. Underneath the victim was a "curdled, rotten substance" that Ms. Jenkins believed was rotten feeding solution. Because of a large indentation in the mattress, the victim had been lying on the hard surface underneath the mattress. A photograph of the indentation and the bugs on the mattress, along with videos of the bugs crawling on the mattress and around the feeding tube, was admitted into evidence.

Ms. Jenkins loaded the victim into the ambulance and called the police department and animal control. When she reentered the home to retrieve her medical bag, the Appellant was removing items from the victim's room. Despite the fire department's prohibition on taking photographs, Ms. Jenkins began taking photographs of the scene to document the "horrific" conditions.

Andrey Volfson, a former patrol officer for the Metropolitan Nashville Police Department ("MNPD"), testified that the fire department requested his assistance at the home. The home had a putrid smell that he compared to the smell of a corpse. He noticed large clumps of animal hair throughout the house and on the walls. The victim was still in her room and appeared "indented into the mattress." She looked thin, extremely sick, and significantly older than her actual age of fifty-five. Mr. Volfson tried to communicate with her, but she was unresponsive. He spoke with the Appellant, the victim's caretaker, who said there was mold in the home. He contacted APS.

Ashley Harrington, an animal control officer, testified that the home was in "kind of [a] deplorable condition[]." In the kitchen, a dog was tied to the kitchen table with a retractable leash. There were piles of feces and a comforter that had been "torn up" and "strewn about the kitchen." The flooring was also torn and "very uneasy to walk on." Ms. Harrington was told there were two cats in the bedrooms. There was a "very full" litterbox in the bathroom and a strong ammonia smell.

Jeremy Ivey, a paramedic for the Nashville Fire Department, testified that there was a strong smell of urine and feces in the home. He observed feces on the floor, and trash covering the floor and the furniture. His boots stuck to the carpet because it was "so filthy."

- 4 -

There was a dog in the home.  When he entered the victim's room, there was a "smell of death."  The victim was lying in a hospital bed and seizing.  There was a feeding bag containing a dried substance attached to an IV pole.  The portion of the feeding tube that attached to the victim's body was lying on the floor "in filth."  He observed cockroaches and other bugs on the victim's body.  There was an "imprint" in the mattress because the victim had not been moved.  The skin on the victim's back was broken from lying in the same position for a long period of time.  The Appellant said she was changing the victim's diaper and was about to start her feeding tube when the victim began seizing.

Defense counsel filed a written motion for a mistrial.  She said that, despite the trial court's ruling that all mentions of the dog should be excluded from testimony, four witnesses mentioned a dog chained to a table in the kitchen.  She argued that this evidence violated Rule 404 and denied her the right to a fair trial.  The court denied the motion, reasoning that the testimony did not go beyond the bounds of its pretrial ruling and if it did, defense counsel failed to contemporaneously object.

Maria Pardue, a paramedic for the Nashville Fire Department, testified that she arrived at the home after the victim had been transported to the hospital.  There was a large stack of boxes and minimal furniture.  As she walked, her feet stuck to the floor.  There was a strong smell of feces and urine.  She observed a large hole in the kitchen floor.  In the victim's room, there was "obvious insect activity, both dead and alive."  There was a large indent in the bed, which develops if a bedbound patient is not rotated regularly.  The portion of the feeding tube that attached to the victim's stomach was on the floor.  The feeding bag contained "dried crackly parts" which indicated that the bag had not been used to administer food recently.  The room did not contain certain medical supplies necessary to care for a bedbound patient, including skin wipes and diapers.  In the bathroom directly across from the victim's room, there was mold in the bathtub and a black substance in the toilet.  Ms. Pardue "went against the rules" of the department and took photographs of the home because she "felt like what [they] saw and what [they] experienced needed to be documented beyond [their] words."

Nurse Blaire Knighton testified that she was working in the emergency room when the victim arrived after having a seizure.  The victim had a preexisting anoxic brain injury that impeded her ability to swallow.  The victim received food and medication from a PEG tube, which was "crusty."  After ensuring the victim was stable, Nurse Knighton cleaned the victim.  There was feces "caked" onto the victim's body and a dead bee in her diaper.  Nurse Knighton removed dead roaches and bugs that had been imprinted into the victim's legs "because she had been [lying] on them for so long."  The victim was extremely thin and her toenails were overgrown.  The victim's hair on the right side had been "rubbed off" and the tissue had been damaged from lying on the same side for too long.  An APS report

was filed within an hour of the victim's arrival because Nurse Knighton "knew that this woman [could not] go back to the place that she [came] from."

The State questioned Nurse Knighton about the care of uninsured patients. Nurse Knighton said the hospital treats uninsured patients and employees are not allowed to ask about a patient's insurance until after the patient has been evaluated by a doctor. If a patient is uninsured, the hospital has employees who can help them get insurance. Nurse Knighton indicated that a patient like the victim should have been able to receive home health services through an insurance program.

On cross-examination, Nurse Knighton acknowledged that tissue damage or "bed sores" can develop even when a patient is receiving proper medical care. People who are immobile and incontinent, like the victim, are at a higher risk of developing bed sores. Bed sores are classified in four stages, with stage four being the most severe. The victim's bed sores were stage one. Nurse Knighton also acknowledged that she could not tell how long it had been since the victim had received her seizure medication.

Nurse Sarah Perry testified that she treated the victim at the hospital. The victim's medical records were admitted into evidence over the objection of defense counsel. The victim was 64 inches tall and weighed only 63.3 pounds, which indicated she was not getting the nutrition she needed. Her skin was damaged from lying on one side continuously. To prevent such damage, a patient must be turned every two hours and their skin must be continually cleaned. The victim received nutrition and seizure medication through a gastric tube. The victim's skin around the tube was "broken down" which indicated the tube was leaking. A leak may occur when a patient's weight drastically changes because the surgically implanted tube is no longer the correct size. The victim's tube was replaced while she was in the hospital. The victim did not have any seizures in the hospital because she was receiving her seizure medication.

One week after the victim's arrival at the hospital, the Appellant came to see her. The Appellant asked Nurse Perry when the victim would be coming home, and Nurse Perry said she was not sure if the victim would be coming home. The Appellant became agitated and told her that she took good care of the victim. The Appellant blamed the victim's malnourishment and bed sores on "[t]he health services." The Appellant returned one week later and again said she wanted the victim to go home with her. She said "the checks" she needed to cover the victim's expenses had stopped coming. She had been caring for the victim for twelve years, but home health stopped coming in January that year. She said she would prefer for the victim to go to a long-term facility if no one was going to help her at home. The victim was discharged to a skilled nursing facility.

On cross-examination, Nurse Perry acknowledged that the victim's PEG tube clogged during her hospital stay, despite being checked multiple times a day. On redirect examination, she emphasized that clogs happen frequently and are easily fixed, whereas surgical replacement of a PEG tube is rare.

Tessa Aquino, a former APS investigative specialist, testified that she was assigned to assist the victim. Four days after the victim's arrival at the hospital, Ms. Aquino met with her. The victim was unable to communicate verbally and was "very skinny and contracted." A photograph of the victim was admitted into evidence. While Ms. Aquino was at the hospital, the Appellant and her children came to see the victim. The Appellant said she was unemployed and survived on the $800 per month in social security income that she received for the victim's care. The Appellant said the victim was supposed to go to Neighborhood Wound Care weekly, but records showed she had only gone three times in the past seven months. The Appellant wanted the victim to return to her home, but the hospital employees wanted her to be discharged to a nursing facility. Ms. Aquino sought emergency temporary custody of the victim. The court order granting temporary custody was admitted into evidence. Ms. Aquino also notified the Social Security Administration that the victim's funds were not being used for her care.

Ms. Aquino referred the victim to Choices, a TennCare program that provides either in-home care or funding for nursing home care. This program would have funded more care than what the victim's insurance provided. However, the victim's insurance would have provided for home health services had the Appellant called the insurance company. The Appellant had been offered additional services through Choices in the past, but declined the services. She did not want her mother to go to a nursing home because "it might affect the life insurance policy." At the mention of a life insurance policy, defense counsel requested a bench conference. Defense counsel argued that the Appellant's statement was from a previous report. The State argued that the report was not hearsay as a public record or report under Rule 803(8), nor was the statement hearsay as a statement of a party opponent under Rule 803(1.2). The trial court overruled the defense's objection.

Ms. Aquino testified that a court granted APS permanent custody of the victim. The victim was discharged to a nursing facility, where she regained a limited ability to swallow. After one year, her weight had almost doubled.

Doctor Brian Carrico testified that he treated the victim at the hospital. When the victim was admitted to the hospital, her PEG tube was non-functioning because it was clogged. The victim, therefore, had not been receiving her seizure medication or nutrition. She was severely underweight and had significant muscle wasting caused by malnutrition. Doctors replaced her PEG tube using interventional radiology. The victim was discharged to a skilled nursing facility. Approximately two years later, she died from COVID-19.

The Appellant testified that she became the victim's caretaker in 2006. At that time, the Appellant was twenty-seven-years-old and had three children ages twelve, nine, and five. The hospital set up twenty-four-hour nursing care, covered by TennCare. TennCare also provided the majority of the necessary medical supplies and transportation to medical appointments. The nurse fed the victim a meal in the mornings, and tube fed the victim at night. When the victim's "trache" was removed, TennCare reduced the nursing care to twenty-seven hours per week, and provided a care assistant ten hours per week. The Appellant was responsible for the victim's care at night. Prior to the victim's hospital admission, the Appellant had been trying to get her a new hospital bed. TennCare said the victim would not be eligible for a new bed until the following year, so the Appellant had been placing extra blankets on top of the mattress.

The Appellant was notified in 2017 that the victim was going to lose her insurance coverage. She wrote a letter to TennCare to try to get the insurance back; the letter was admitted into evidence. Her appeal was denied. The Appellant began having to pay for the victim's supplies such as Ensure and diapers. The victim's social security income was usually not enough to cover their bills and expenses, and her sister and aunt "pitched in [] routinely." She could not work because she had to care for the victim. She did not take the victim to doctor's appointments because she did not have reliable transportation. She did take the victim to the hospital sometime in 2018 when she could not afford Ensure. Then, Medicaid began paying for feeding solution and bags. The Appellant changed the victim's clothes and bedding every other day. In the mornings, the Appellant would put the victim in her wheelchair until midday. The Appellant lived in Section 8 housing, and the home was "falling apart." She was in the process of moving.

The Appellant described the day paramedics took the victim to the hospital. The Appellant was gone for an hour and a half that morning. When she returned, the victim was having a seizure. She pulled the covers back, and the victim's feeding tube fell on the floor. She did not tell Ms. Jenkins that she had just fed the victim. She only tube fed the victim at night. She emphasized that she tried to do what she could and did not realize the victim was in danger in her care.

On cross-examination, the Appellant said she gave the victim Ensure because she could not afford the feeding solution. The Appellant acknowledged that there was an APS referral in 2017, while the victim still had some home health services. She said James Calway at APS told her that he could help her get additional care through TennCare and Choices. She denied, however, that she expressed concern about losing life insurance proceeds if she enrolled the victim in Choices. She said the victim never had life insurance. On redirect examination, she said the reason she did not want to enroll the victim in the Choices program is because if TennCare decided not to cover the services, she would be

financially responsible for them. The photographs of the Appellant's home taken during the 2017 APS investigation were admitted into evidence. The photographs, which the Appellant said were an accurate representation of what the home usually looked like, showed a clean kitchen and living room.

On rebuttal, James Calway, an APS investigative specialist, testified that he investigated a report about the poor condition of the Appellant's home in 2017. The home was infested with cockroaches. Mr. Calway referred the victim to Choices, which would provide five additional hours of care and free pest control. The Appellant said she anticipated getting a life insurance policy and was concerned how the Choices program would affect her ability to do so. He never told her that she might have to pay for the home health or pest control services. A Choices representative attempted to contact the Appellant but the Appellant did not return any of her phone calls.

The jury convicted the Appellant of the lesser included offense of neglect of an impaired adult.[1] After a hearing, the trial court sentenced the Appellant to seven years' supervised probation. The Appellant filed an unsuccessful motion for new trial.

## ANALYSIS

On appeal, the Appellant challenges several of the trial court's rulings on the admissibility of evidence. The admissibility of evidence rests within the sound discretion of the trial court, whose ruling we will not disturb absent an abuse of discretion. State v. Clayton, 535 S.W.3d 829, 859 (Tenn. 2017). A trial court abuses its discretion when it "applies an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007) (quoting State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006)).

To be admitted, evidence must be relevant. Tenn. R. Evid. 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Even relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Unfair prejudice is "an undue tendency to suggest decision on an improper basis, commonly,

---

[1] Though it does not impact this appeal, the definition of neglect of an impaired adult provided in the jury instruction contains an error. The trial court instructed the jury that it must find that the defendant grossly neglected an impaired adult. The statute contains no such requirement. See Tenn. Code Ann. § 71-6-117 (2017) (amended 2019, repealed 2020) ("It is an offense for any person to knowingly, other than by accidental means, abuse or neglect any adult within the meaning of this part.").

though not necessarily, an emotional one." State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403 advisory committee note).

I. **404(b) Evidence of Animal Neglect**. The Appellant argues that the trial court erred by allowing witnesses to describe conditions of animal neglect in her home. She specifically points to Ms. Harrington's testimony, wherein she said she was summoned to the home as an animal control officer and described piles of feces, a "very full" litterbox, an overwhelming ammonia smell, and a dog tied to the kitchen table with a retractable leash. She also points to Ms. Jenkins' testimony that it looked like the dog had been trying to eat the kitchen floor. She contends that this testimony of a prior bad act violated Tennessee Rule of Evidence 404(b) because it was only relevant to prove her character. Alternatively, she argues that even if the testimony was admissible for another purpose, it should have been excluded because its probative value was outweighed by the danger of unfair prejudice. See Tenn. R. Evid. 404(b)(4). The danger of unfair prejudice lies in the "opportunity for the jury to infer that, because [the Appellant] did not properly care for her pets, she must also have committed the crime of neglect charged in this case." The State responds that evidence of the conditions the victim was subjected to in the Appellant's home was relevant to prove the charged offense of gross neglect of an impaired adult. We conclude that the testimony related to the conditions of the home was properly admitted, but the testimony about the dog being tied to the kitchen table with a retractable leash and trying to eat the floor should have been excluded.

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). This rule recognizes that such evidence "carries with it the inherent risk of the jury convicting the defendant of a crime based upon his bad character or propensity to commit a crime," rather than convicting him based on the strength of the evidence. State v. Thacker, 164 S.W.3d 208, 239 (Tenn. 2005) (citing State v. Rickman, 876 S.W.2d 824, 828 (Tenn. 1994)). This risk is "particularly strong when 'the conduct or acts are similar to the crimes on trial.'" State v. Clark, 452 S.W.3d 268, 289 (Tenn. 2014) (quoting Rickman, 876 S.W.2d at 828). Such evidence, however, may be admissible for "other purposes" such as establishing motive, intent, guilty knowledge, identity of the defendant, absence of mistake or accident, a common scheme or plan, contextual background, opportunity, or preparation. Tenn. R. Evid. 404(b); State v. Berry, 141 S.W.3d 549, 582 (Tenn. 2004).

Before admitting evidence of other crimes, wrongs, or acts, the following requirements must be met:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). If the trial court substantially complies with these requirements, we will review its ruling for an abuse of discretion. Clark, 452 S.W.3d at 287 (citing State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997)). Without substantial compliance, however, the trial court will be afforded no deference. DuBose, 953 S.W.2d at 652.

Because the trial court failed to evaluate whether the danger of unfair prejudice outweighed the evidence's probative value, we will review its ruling de novo. See id.; State v. Sexton, 368 S.W.3d 371, 404 (Tenn. 2012) (holding that the trial court's ruling was not entitled to deference when it failed to find that the prior act was proven by clear and convincing evidence). Prior to trial, the trial court prohibited the State from presenting direct testimony about the neglect of animals. The court declined, however, to limit testimony about the conditions of the home, including those that suggested an animal in the home was being neglected. After a de novo review, we conclude that though the majority of the testimony was admissible to establish gross neglect of the victim, the testimony about the dog being tied to the kitchen table with a retractable leash and trying to eat the floor should have been excluded.

Testimony about the conditions of the home, including the feces, full litter box, and ammonia smell was properly admitted. This evidence was relevant to establish that the Appellant grossly neglected the victim, which was an element of the charged offense. Tenn. Code Ann. § 71-6-119(a) (2007) (amended 2019, repealed 2020) ("It is an offense to knowingly, other than by accidental means, physically abuse or grossly neglect an impaired adult if the abuse or neglect results in serious mental or physical harm."). The proof of the conditions of the home is clear and convincing based on the photographs of the home and the testimony of multiple witnesses who observed the conditions. Though this evidence could lead to an inference that the Appellant neglected her animals, the danger that the jury convicted on this improper basis does not outweigh its probative value. The probative value is substantial because the testimony shows that the Appellant failed to maintain a sanitary environment necessary for the victim's care.

Testimony about the dog being tied to the kitchen table with a retractable leash and trying to eat the kitchen floor, however, should have been excluded. These specific facts are not relevant to establish an essential element of the charged offense or for any other permissible purpose. The testimony was therefore inadmissible under Rule 404(b). The erroneous admission of the testimony, however, does not entitle the Appellant to relief because she cannot show that it more probably than not affected the verdict. See Clark, 452 S.W.3d at 287 (when a trial court erroneously admits evidence, the defendant bears the burden of showing that the evidence more probably than not affected the verdict); Tenn. R. App. P. 36(b). There was overwhelming evidence that the Appellant neglected the victim. The victim's PEG tube was non-functioning, meaning that she had not been receiving adequate nutrition or medication. She was severely underweight, covered in bugs and feces, and lying in rotten feeding solution. She had not been rotated as required for bedbound patients, causing bed sores and a large indention in her mattress. Accordingly, the error was harmless.

**II. Dr. Carrico's "Travesty" Statement**. The Appellant next argues that the trial court abused its discretion by refusing to redact the following statement from the victim's medical records:

> APS contacted. It will be a travesty if APS does not seek removal from her current living situation. The patient had a clogged PEG tube and was not receiving nutrition nor medication. She was covered in excrement (per EMS) and her daughter will not participate in her discussions regarding her care (per Palliative Care). Long term placement will be needed.

She contends that the statement was not relevant because it makes no material issue more or less probable. See Tenn. R. Evid. 401. Alternatively, she argues that even if the statement was relevant, its probative value is substantially outweighed by its cumulative nature and the danger of unfair prejudice. See Tenn. R. Evid. 403. The State responds that the statement was relevant "as Dr. Carrico's expert opinion about the necessary medical treatment for [the victim]" because the State had to prove the victim was an impaired adult. The State also contends that the statement's probative value was not substantially outweighed by the danger of unfair prejudice because the statement was not highlighted to the jury and appeared on two pages of an eight hundred and forty-five page exhibit.

The admission of Dr. Carrico's statement describing the severity of the victim's condition and the need to remove her from the Appellant's home was not an abuse of discretion. First, the statement was relevant because it made it more probable that the Appellant grossly neglected the victim and that the neglect resulted in serious physical harm, both of which were elements of the charged offense. See Tenn. Code Ann. § 71-6-119(a) (2007) (amended 2019, repealed 2020) ("It is an offense to knowingly, other than

by accidental means, physically abuse or grossly neglect an impaired adult if the abuse or neglect results in serious mental or physical harm.").  Second, the statement's probative value was not substantially outweighed by the danger of unfair prejudice.  See Tenn. R. Evid. 403.  Though the Appellant expresses concern about the use of the word "travesty," we agree with the State that the danger of unfair prejudice was minimal.  The statement appeared on two pages of the eight hundred and forty-five pages of medical records admitted into evidence and was not highlighted to the jury.  Accordingly, the danger of unfair prejudice did not substantially outweigh the statement's probative value in establishing the elements of the charged offense.

**III.  <u>Hearsay Within Hearsay</u>**.  The Appellant argues that the trial court erred by allowing Ms. Aquino to testify that the Appellant previously said applying for a long-term care program could affect her ability to collect the victim's life insurance.  This statement was contained in a prior APS report, which was not prepared by Ms. Aquino and was not admitted into evidence.  The Appellant contends that though the Appellant's statement was admissible as an admission of a party-opponent, Ms. Aquino's testimony about what she read in the report did not fit within the business records exception.[2]  Though the State does not explicitly concede error, it argues only that the testimony did not prejudice the Appellant because the statement was also properly admitted through Mr. Calway.  We agree with the Appellant.

Hearsay is generally not admissible.  Tenn. R. Evid. 802.  Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Tenn. R. Evid. 801(c).  However, there are several exceptions to the general prohibition on hearsay.  See Tenn. R. Evid. 803.  If an out-of-court statement contains multiple levels of hearsay, referred to as "hearsay within hearsay," the statement is not admissible unless each level fits within a hearsay exception.  Tenn. R. Evid. 805.  Two exceptions are relevant in this appeal—an admission by a party-opponent and public records and reports.  First, a statement offered against a party that is "the party's own statement in either an individual or a representative capacity" is not excluded by Rule 802.  Tenn. R. Evid. 803(1.2).  Second, a record "of public offices or agencies setting forth the activities of the office or agency or matters observed pursuant to a duty imposed by law as to which matters there was a duty to report" is not excluded by Rule 802 "[u]nless the source of information or the method or circumstances of preparation indicate lack of trustworthiness."  Tenn. R. Evid. 803(8).

Whether a statement qualifies as hearsay and whether it fits within one of the exceptions to the hearsay rule are questions of law subject to de novo review.  <u>Kendrick v.</u>

---

[2] Though the Appellant claims that the trial court admitted the testimony as a business record, the trial transcript reflects that the court instead admitted it as a public record.

State, 454 S.W.3d 450, 479 (Tenn. 2015) (citing State v. Schiefelbein, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007)). The trial court's factual findings and credibility determinations, however, are binding unless the evidence in the record preponderates against them. Id. (citing State v. Gilley, 297 S.W.3d 739, 759-61 (Tenn. Crim. App. 2008)).

Ms. Aquino testified about a statement made by the Appellant and documented in an APS report. She did not have firsthand knowledge of this statement and was testifying about her memory of the contents of the APS report. The trial court overruled the Appellant's objection after the State argued that the testimony was admissible because it was an admission by a party opponent contained in a public record.

The trial court erred by allowing this testimony because, though the Appellant's statement was admissible as a statement by a party-opponent, Ms. Aquino's testimony about what she read in the report was not admissible under the public records exception. See Tenn. R. Evid. 803(1.2), (8). In State v. B.F., the Tennessee Court of Appeals held that the business records exception provides for the admission of records, not the admission of witness testimony about her memory of the contents of the record. State v. B.F., No. E2004-00338-COA-R3-PT, 2004 WL 2752808, *2-3 (Tenn. App. Dec. 2, 2004), no perm. app. filed. This holding was based on the exception's text and underlying principle. Id. The text clearly indicated that the rule applied only to tangible documentation—"[a] memorandum, report, record, or data compilation, in any form." Id. at *3 (quoting Tenn. R. Evid. 803(6)). Additionally, business records are exempt from the general prohibition against hearsay because "regularly kept records typically have a high degree of accuracy." Id. (quoting 2 McCormick on Evidence § 286 (John W. Strong, 5th ed. 1999)). A witness's testimony about the record's contents, however, does not exhibit the same high degree of accuracy. Id. This logic applies equally to the public records exception. See Tenn. R. Evid. 803(8) (public records include "records, reports statements, or data compilations in any form"). Accordingly, Ms. Aquino's testimony about a statement she read in a previous APS report of which she had no firsthand knowledge was inadmissible. See also Lumpkin v. State, 524 S.W.2d 302, 305 (Tex. Crim. App. 1975) (holding that witness testimony based on knowledge gained by studying records is inadmissible hearsay, regardless of whether the underlying record falls within a hearsay exception).

This error, however, does not entitle the Appellant to relief because she cannot show that it more probably than not affected the verdict. See Clark, 452 S.W.3d at 287 (when a trial court erroneously admits evidence, the defendant bears the burden of showing that the evidence more probably than not affected the verdict); Tenn. R. App. P. 36(b). The Appellant's statement contained in the report was properly admitted through Mr. Calway, who had firsthand knowledge of the statement. On rebuttal, Mr. Calway testified that the Appellant failed to apply to Choices in 2017 after expressing concern about a life insurance

policy. Therefore, even if the trial court had properly excluded Ms. Aquino's testimony about the statement, the statement would have been admitted into evidence.

**IV. <u>Cumulative Error</u>.** While not directly raised in the issues presented, the Appellant weaves into her argument that if the alleged evidentiary errors do not alone warrant relief, their cumulative effect deprived her of a fair trial. We disagree.

The cumulative error doctrine recognizes that "there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." <u>State v. Hester</u>, 324 S.W.3d 1, 76 (Tenn. 2010). The doctrine applies when there has been more than one error committed in trial proceedings, but circumstances warranting a reversal are rare. <u>Id.</u> at 76-77; <u>see also</u> <u>State v. Gilliland</u>, 22 S.W.3d 266, 273 (Tenn. 2000) ("Although the Constitution of our state and of the United States guarantees criminal defendants the right to a fair trial, neither guarantees criminal defendants the right to a perfect trial."). The Tennessee Supreme Court has provided the following guidance for assessing whether the aggregated errors deprived the defendant of a fair trial:

> A reviewing tribunal must consider each such claim against the background of the case as a whole, paying particular weight to factors such as the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the [trial] court dealt with the errors as they arose (including the efficacy—or lack of efficacy—of any remedial efforts); and the strength of the [State's] case. The run of the trial may also be important; a handful of miscues, in combination, may often pack a greater punch in a short trial than in a much longer trial.

<u>Hester</u>, 324 S.W.3d at 77 (quoting <u>United States v. Sepulveda</u>, 15 F.3d 1161, 1196 (1st Cir. 1993)).

The cumulative effect of the two errors identified was not so great as to require reversal. The erroneous admission of Ms. Aquino's testimony about the Appellant's statement had little, if any, effect on the trial because the statement was properly admitted through Mr. Calway. In other words, the jury would have heard the statement about the Appellant's purported financial motive for the offense regardless of the trial court's ruling on the Appellant's hearsay objection. Therefore, even when combined with the erroneous admission of testimony related to animal neglect, the effect was harmless.

## CONCLUSION

We conclude that there was no reversible error and affirm the judgment of the trial court.

_____
CAMILLE R. MCMULLEN, PRESIDING JUDGE